**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| DR PEPPER SNAPPLE GROUP, INC., and MANANTIALES PEÑAFIEL, S.A. DE C.V., <br><br> *Plaintiffs,* <br><br> v. <br><br> BEBIDAS PURIFICADAS DE TEHUACAN, S.A. DE C.V., and CENTAURO DISTRIBUTION LLC, <br><br> *Defendants.* | Case No. 3:17-cv-00929 <br><br> JURY TRIAL DEMANDED |

---

**PLAINTIFFS' COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF**

---

1.      Plaintiffs bring this action against Defendants because they have adopted packaging for their sparkling mineral water that copies Plaintiffs' unique packaging trade dress for its Peñafiel line of sparkling mineral water. Because of this copying, Defendants' packaging is likely to deceive consumers and dilute the distinctive quality of Plaintiffs' Peñafiel family of products. By copying the key design elements of Peñafiel's trade dress, including, among other things, the same font, coloring scheme, and organization of design elements, Defendants are infringing upon Peñafiel's federal trade dress rights as well as violating Texas law. Peñafiel seeks preliminary and permanent injunctive relief, disgorgement of Defendants' profits, and damages as set forth below.

**JURISDICTION AND VENUE**

2.      This Court has original subject matter jurisdiction over the federal law claims under 15 U.S.C. § 1051 et. seq., pursuant to 28 U.S.C. §§ 1331 and 1338. This Court also has

jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

3. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400 because Defendants have committed and continue to commit tortious acts in this judicial district, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this judicial district.

**PARTIES**

4. Dr Pepper Snapple Group, Inc. ("DPSG") is a corporation duly organized and existing under the laws of the State of Delaware with a principal place of business at 5301 Legacy Drive, Plano, Texas 75024. DPSG manages the Peñafiel family of products through its subsidiaries, including Mott's LLP and The American Bottling Company, each of which is organized and existing under the laws of the State of Delaware, and each of which is authorized by Manantiales Peñafiel, S.A. de C.V. (the Mexico trademark owner and a DPSG subsidiary) to import and distribute Peñafiel products from Mexico.

5. Manantiales Peñafiel, S.A. de C.V. ("MAPSA") is a Mexican corporation with a principal place of business at José Garci Crespo # 2805, Colonia San Nicolas Tetitzintla, Tehuacan Puebla, 75710 Mexico. MAPSA owns the Peñafiel trademark and produce the family of products. As a wholly-owned subsidiary of DPSG, and as discussed above, the import and distribution in the United States of the Peñafiel product line is provided by DPSG's U.S. subsidiaries.

6. Centauro Distribution LLC is a corporation duly organized and existing under the laws of the State of Texas and is headquartered at 1000 Billy Mitchell Blvd., Brownsville, Texas 78521. Centauro is the U.S. distributor for Tehuacan's beverages and is directly responsible for

the distribution of Tehuacan's beverages in this district.

7.     Bebidas Purificadas de Tehuacan, S.A. de C.V. ("Tehuacan") is a Mexican corporation headquartered at Av. Nacional No. 74, San Lorenzo Teotipilco, Tehuacán, Puebla, Mexico, CP 75855. Plaintiffs are informed and believe that Tehuacan regularly conducts and solicits business in the State of Texas. Plaintiffs are informed and believe that Tehuacan is involved in the design of packaging for, marketing of, production, and distribution in Texas of Tehuacan beverages. On its website, Tehuacan describes the distribution of its products as including Brownsville, Texas.



*See* http://www.brillante.com.mx/servicios.html.

**The Peñafiel Family of Beverages**

8.     Peñafiel has a long history, dating back to 1948, when the Peñafiel family began bottling naturally carbonated mineral water at Tehaucan, Mexico. The historic spring waters in Tehuacan have been famous for centuries. Peñafiel became the leading brand of Mexican mineral water in the decades after its introduction. It remains a famous brand in Mexico and is well known to consumers throughout Mexico.

9.     In 1992, Cadbury Schweppes acquired Peñafiel, and its product line expanded to include additional flavored waters. DPSG spun off from Cadbury Schweppes in 2008, keeping MAPSA and the Peñafiel brand and related intellectual property, and it has continued to expand the marketing and distribution of Peñafiel in the United States.

10.     Since late 2014, all Peñafiel products sold in the United States have been imported from Mexico and are labeled "Hecho en Mexico" so that consumers in the United States already familiar with Peñafiel can be assured of its authenticity.

11.     Peñafiel is sold primarily in Hispanic and other regional/local grocery stores and convenience stores in Texas, southern California, and Chicago, Illinois. In Texas, it is sold in several chains, including Fiesta Mart, H.E.B., and La Michoacana stores. Plaintiffs estimate that in 2016 alone, more than one million cases of Peñafiel products were sold in the United States, most of those in Texas.

12.     Peñafiel is typically merchandized in grocery stores in groups of several different flavors, and the packaging contributes to a consistent presentation across flavors and sizes that catches consumers' attention, as shown in these images from convenience stores and grocery markets in Texas:





13.     Over time, the packaging used for Peñafiel has changed, although key design elements have existed for more than a decade. The current Peñafiel packaging is as follows:



14.     This Peñafiel packaging has been used since at least 2012, but many of the key elements were used for years before that date. Key elements of the Peñafiel packaging include: a distinctive font that was hand-drawn for Peñafiel, text sloping up and to the right, text that is white with a red outline, light blue bubbles above the name "Peñafiel," and for flavored beverages, the position of the flavor name, an image of the fruit below and to the right of the label (usually below a green tag), and a color that matches the flavor of the drink.



15.     The overall design and appearance of the Peñafiel packaging is inherently distinctive and non-functional and serves as an indicator of origin for Peñafiel products ("Peñafiel Trade Dress").

16.     In 2016 alone, Plaintiffs spent more than $1 million in Peñafiel advertising and marketing, primarily in three major Texas cities. Advertising included radio ads as well as local contests and engagement experiences at festivals, sporting events, and retail locations.

17.     As a result of Plaintiff's sales and marketing efforts, as well as its fame in Mexico, the Peñafiel Trade Dress is well-recognized by consumers and has acquired secondary meaning as an indicator of origin for Peñafiel products, particularly among consumers familiar with Peñafiel in Mexico. The Peñafiel Trade Dress has come to proclaim, represent and

symbolize the outstanding quality of DPSG and MAPSA products and enjoys substantial

goodwill among consumers.

18.     To protect its intellectual property, DPSG and MAPSA diligently enforce their

rights in the Peñafiel Trade Dress against competitors who attempt to use confusingly similar

packaging. These policing efforts are necessary to ensure that the Peñafiel Trade Dress remains

unique and highly distinctive and is not copied and diluted by competitors.

### Tehuacan's History and Copied Trade Dress

19.     Tehuacan manufactures, advertises, and sells sparkling mineral water, flavored

and unflavored. Tehuacan claims that its mineral water comes from Mt. Tehuacan, the source of

the water bottled by Peñafiel or its predecessors for more than 70 years.

20.     Upon information and belief, Tehuacan originally began business as a bottler for

other companies' products. It then began bottling its own brand of mineral water, claiming that it

originated, like Peñafiel, from the springs in and around Mt. Tehuacan, Mexico. Upon

information and belief, Tehuacan's products were not imported into the United States until 2011,

at the earliest. At that time, Tehuacan had different labeling and the volume of its United States

imports appeared to be minimal. In recent years, Tehuacan has obtained increasingly wider

distribution in Mexico, and has gained some distribution in Texas, too.

21.     Upon information and belief, Tehuacan began using new packaging for its

mineral water beverages ("Tehuacan Trade Dress") in 2013 or 2014. For each of its six or more

varieties of flavored mineral water, the key design elements of the Tehuacan Trade Dress are the

same as or confusingly similar to the Peñafiel Trade Dress.

22.     For example, the Twitter feed for Tehuacan included this photo on February 20, 2013, announcing its new flavored mineral water:



23.     The Tehuacan Trade Dress can also be seen on its website at

http://www.brillante.com.mx/img/slider/refrescos-brillante-sabores.jpg:



24.     Tehuacan is using the same elements of trade dress — the same font, text colors, slope of the product name, image of fruit, etc. — for each of its varieties of competing flavored mineral water.

25.     The Tehuacan Trade Dress is, when viewed by the ordinary observer, very similar in appearance and likely to be mistaken for, Peñafiel Trade Dress. The two beverages, both in Strawberry flavor, are shown side-by-side together:




26.     Tehuacan mineral water is advertised and sold in the United States in the same marketing channels, stores, and shelves as the Peñafiel mineral water products. For example, Plaintiffs have found it on the shelves in Fiesta Mart in this district and at convenience stores.

27.     As a further example of how the marketing channels are the same, Plaintiffs note that the Tehuacan Twitter account in December 2015 included a photo showing advertisements for Peñafiel and Tehuacan side-by-side:



28.     Upon information and belief, Tehuacan had knowledge of the Penfiel Trade Dress and designed the Tehuacan Trade Dress intending to copy the Peñafiel Trade Dress and obtain consumer recognition and interest based upon the success and reputation of the Peñafiel products.

29.     In fact, as the Peñafiel Trade Dress has changed slightly over the years, the Tehuacan Trade Dress has mimicked these changes. In 2009, Defendant Bebidas submitted a trademark registration for "BRILLANTE" to the US Trademark Office with specimens that included "Tehuacan" written in a red font with blue lettering:



At the same time, it also submitted a specimen with red lettering with a white background and a much different trade dress for its flavored products:



But in May 2014, Defendant Bebidas submitted a specimen that mimicked many of the elements of the Peñafiel Trade Dress:



30.     Tehuacan's advertising and sale of mineral water using the Tehuacan Trade Dress is likely to cause initial interest, point of purchase, and/or post sale confusion, mistake, and/or deception among customers and potential customers that the Tehuacan line of beverage products originate from the maker of the Peñafiel products, or that the Tehuacan line of beverage products is affiliated with, sold with the permission of, or approved, sponsored, or licensed by the maker of the Peñafiel products.

31.     Tehuacan's use of the Tehuacan Trade Dress trades on the goodwill DPSG and MAPSA have established in the Peñafiel Trade Dress, and places the valuable reputation of the Peñafiel products in the hands of a third party over whom DPSG has no control.

32.     As a result of Tehuacan's conduct, including its use of the Tehuacan Trade Dress, DPSG and MAPSA believe they have suffered lost or diverted sales and other economic damages to their business. Because Tehuacan now appears to be gaining additional market penetration and distribution, Plaintiffs anticipate additional damage to their business.

## FIRST CAUSE OF ACTION
## TRADE DRESS INFRINGEMENT UNDER THE LANHAM ACT
## (15 U.S.C. § 1125(a))

33.     DPSG and MAPSA incorporate as if fully set forth herein the allegations of Paragraphs 1 through 32 above.

34.     Tehuacan's conduct described above constitutes infringement of Plaintiffs' rights in the Peñafiel Trade Dress and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a).

35.     Plaintiffs are informed and believe that Tehuacan's infringement of the Peñafiel Trade Dress has been willful.

36.     Plaintiffs have been and will continue to be irreparably harmed and damaged by Tehuacan's conduct, and Plaintiffs lack an adequate remedy at law to compensate for this harm and damage.

## SECOND CAUSE OF ACTION
## UNFAIR COMPETITION BY PASSING OFF
## (15 U.S.C. § 1125(a))

37.     DPSG and MAPSA incorporate as if fully set forth herein the allegations of Paragraphs 1 through 36 above.

38.     Consumers associate the Peñafiel Trade Dress with Plaintiffs; consumers believe that products packaged with the Peñafiel Trade Dress originate with Plaintiffs.

39.     By mimicking and copying the Peñafiel Trade Dress, Tehuacan is passing off its sparkling mineral water as Peñafiel and creating a likelihood of consumer confusion. This violates the Lanham Act, 15 U.S.C. § 1125(a).

40.     Plaintiffs are informed and believe that Tehuacan's passing off has been willful.

41.     Plaintiffs have been and will continue to be irreparably harmed and damaged by Tehuacan's conduct, and Plaintiffs lack an adequate remedy at law to compensate for this harm and damage.

## THIRD CAUSE OF ACTION
## VIOLATION OF TEXAS ANTI-DILUTION LAW

42.     Plaintiffs incorporate as if fully set forth herein the allegations of Paragraphs 1 through 41 above.

43.     Defendants' conduct described above is likely to injure Plaintiffs' business and/or dilute the distinctive quality of Plaintiffs' Peñafiel Trade Dress in violation of Tex. Bus. & Com. Code § 16.103.

44.     Plaintiffs are informed and believe that Defendants' violation of the Texas Anti-Dilution Statute has been willful.

45.     Plaintiffs have been and will continue to be irreparably harmed and damaged by Defendants' conduct, and Plaintiffs lack an adequate remedy at law to compensate for this harm and damage.

## FOURTH CAUSE OF ACTION
## COMMON LAW UNFAIR COMPETITION

46.     Plaintiffs incorporate as if fully set forth herein the allegations of Paragraphs 1 through 45 above.

47.     Defendants' acts described above trade upon the goodwill established by Plaintiffs in the Peñafiel Trade Dress and constitute unfair competition under the common law of the State of Texas.

48.     Plaintiffs are informed and believe that Defendants' acts of unfair competition have been willful.

49.     Defendants have been unjustly enriched by their acts of unfair competition.

50.     Plaintiffs have been and will continue to be irreparably harmed and damaged by Defendants' conduct, and Plaintiffs lack an adequate remedy at law to compensate for this harm and damage.

WHEREFORE, Plaintiffs DPSG and MAPSA pray for entry of an order and judgment that:

1.     Defendants have infringed the Peñafiel Trade Dress in violation of 15 U.S.C § 1125;

2.     Defendants are in violation of Tex. Bus. & Com. Code § 16.103;

3.     Defendants and their officers, agents, servants, employees, owners, representatives, and all other persons, firms, or corporations in active concert or participation with them, be enjoined and restrained from infringing the Peñafiel Trade Dress because it is likely to cause confusion as to whether Defendants' beverages originate from the same source as the Peñafiel family of mineral water products, or as to an association, affiliation, or connection between Defendants and the source of the Peñafiel family of mineral water products;

4.     Defendants and their officers, agents, servants, employees, owners, representatives, and all other persons, firms, or corporations in active concert or participation with them, be enjoined and restrained from using the Tehuacan Trade Dress or any other bottle packaging likely to dilute the distinctive quality of the Peñafiel Trade Dress;

5.     Defendants, pursuant to 15 U.S.C. § 1116(a), shall file with this Court and serve upon Plaintiffs within thirty (30) days after entry of the injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

6.      Defendants, pursuant to 15 U.S.C. § 1118, shall deliver up for destruction, or show proof of said destruction, all products, displays, containers, closures, labels, signs, prints, packages, promotional items or other matter in the possession, custody or control of Defendants bearing or embodying the Tehuacan Trade Dress and any means of making the same;

7.      Defendants are liable to Plaintiffs for all actual, compensatory, and/or consequential damages suffered by Plaintiffs;

8.      Defendants' profits for sales of infringing products shall be disgorged to Plaintiffs;

9.      Defendants are liable for exemplary damages, to the maximum extent permitted by Texas and federal law; and

10.      Plaintiff is entitled to recovery of its reasonable and necessary attorney's fees and costs incurred in the prosecution of this lawsuit.

Dated:  March 31, 2017                Respectfully submitted,

*/s/ Aaron Davidson*
Aaron Davidson
Texas Bar No. 24007080
Tim Craddock
Texas Bar No. 24082868
KLEMCHUK LLP
Campbell Centre II
8150 North Central Expressway, 10th Floor
Dallas, TX 75206
Telephone:  (214) 367-6000
Facsimile:  (214) 367-6001
aaron.davidson@klemchuk.com
tim.craddock@klemchuk.com

***Attorneys for Plaintiffs***
***Dr Pepper Snapple Group, Inc. and***
***Manantiales Peñafiel, S.A. de C.V.***

16